IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GWENDOLYN CANN et al.        :
                             :
v.                           :   Civil No. WMN-10-2213
                             :
BALTIMORE COUNTY, MARYLAND   :
 et al.                      :

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM

Before the Court is Defendants' Motion for Summary
Judgment.  ECF No. 34.  The motion is fully briefed.  Upon
review of the papers, exhibits, and the applicable case law, the
Court determines that no hearing is necessary, Local Rule 105.6,
and that the motion should be granted.

I. FACTUAL BACKGROUND

This action arises out of the February 29, 2008, fatal
shooting of Taevon Cann by several officers of the Baltimore
County Police Department (BCPD).  By the happenstance of the
shooting taking place at a gas station monitored by two video
surveillance cameras, an unusually clear record of what occurred
at the scene is available to the parties and the Court.  The
events leading up to the immediate scene of the shooting are
also largely undisputed.

In late 2007 and early 2008, the BCPD conducted an "enforcement detail" in a Dundalk neighborhood that had been experiencing an increase in gang violence and related criminal activity.  During the course of that operation, the police received an anonymous complaint about drug activity at a particular address, 2940 Yorkway, and involving a particular blue Buick.  The informant also advised that there were guns present at the location.  Subsequent investigation revealed that four individuals were selling crack cocaine from that address although, during the course of the investigation, they moved their operation to 2930 Yorkway.  Plaintiff's deceased, Taevon Cann, was identified as one of the individuals engaged in selling cocaine.  In addition, the dark blue Buick Park Avenue associated with the drug operation was registered to Cann.

On February 28, 2008, BCPD officers set up covert surveillance of 2930 Yorkway and observed and confirmed two separate narcotics transactions.  A criminal records check was run on Cann which revealed that Cann had numerous criminal convictions including: handgun on person, second degree assault, resisting arrest, failure to obey a lawful order, drug possession, and attempting to disarm a police officer.  Based upon the information gathered in the investigation, a no-knock search and seizure warrant for that address was applied for and

a warrant was issued by a state judge.  The original plan was to
have a SWAT team assist in the execution of the warrant that
same day.  By the time the officers were in place, however, the
drug activity had ceased and the officers were uncertain if the
suspects were still present in the house.

On February 29, 2008, drug activity was again observed at
2930 Yorkway and it was confirmed that the subjects named in the
warrant were at that location.  Unfortunately, the SWAT team had
been detailed to another operation and it was determined by
Sergeant Rakowski that it would be too dangerous to attempt to
execute the warrant without the assistant of the SWAT team.
Sergeant Rakowski decided to wait until the suspects left the
premises in the Buick, which was also named in the warrant, and
then make a traffic stop.

Sergeant Rakowski requested two uniformed officers to
assist in the proposed traffic stop and officers Hoerr and
Mitchell were assigned to the operation.  Both were operating
marked police cruisers.  Sergeant Rakowski, in an undercover
Nissan pickup driven by Detective Gary Brown, met up with Hoerr
and Mitchell at a Fire Station near the Yorkway address.  While
Rakowski was briefing the officers at the Fire Station on the
operational plan, he was informed by Detective Garnek, who had

continued to watch the subject location, that Cann and another suspect, Ellis Davis, were leaving the location in the Buick. Rakowski outlined the plan to the assembled officers. Two unmarked vehicles would box in the Buick – one in front and one alongside the driver's side – until they reached a safe place for the felony traffic stop. A marked cruiser with lights and sirens would then attempt to stop the Buick.

While Rakowski was conducting the briefing, Detectives Rogers and Kilpatrick, who were in an unmarked Chevy Lumina near the 2930 Yorkway address, observed the suspect Buick drive by them and they commenced following it. The officers at the Fire Station turned towards where Rogers and Kilpatrick had observed the Buick and, almost immediately, saw it pass them in the opposite direction. The three vehicles, the unmarked Nissan pickup and the two police cruisers, made U turns and fell in behind the Lumina and the Buick.

The officers testified that they observed Cann and Davis squirming in their seats and looking back at them. Rakowski Dep. at 16; Brown Dep. at 21-22. In addition to seeing the police cruisers, Rakowski and Brown testified that they believed Cann and Davis would have recognized the unmarked vehicles as police vehicles as they had been patrolling in that area in those vehicles for some time as part of the crackdown on the

drug operations.  Id.  The passenger in the vehicle, Davis,
however, submitted an affidavit stating that "[w]e had no idea
that the police were following us."  Davis Aff. ¶ 3.

    Immediately after the three cars made the U turn, the Buick
made a right turn into a gas station.  The Buick pulled
alongside the right side of one of the pumping stations (so that
the driver's side of the vehicle was nearest the pump) and
stopped.  The four police vehicles pulled into the gas station
immediately behind the Buick: Detective Rogers pulled the Lumina
around the left side of the same pumping station and stopped
immediately in front of the Buick, at an angle; Detective Brown
stopped the Nissan truck on the passenger's side of the Buick,
slightly behind the Buick and several feet away; Officer Hoerr
pulled his marked cruiser behind the Buick, but a car length or
two behind it; Officer Mitchell pulled his marked cruiser behind
the Lumina just behind the left side of the pumping station.
As soon as the officers stopped their vehicles, they jumped out,
pulled their weapons, and commanded Cann and Ellis to get out of
their vehicles with their hands up.  Hoerr and Mitchell were
wearing full police uniforms.  Rakowski, Brown, Rogers and
Kilpatrick were in plain clothes but wore bullet-resistant vests
with badges and police insignia.  Less than two seconds after
the officers exited their vehicles, Cann revved the engine and

threw the car in reverse. Cann turned his steering wheel so that the back of the Buick was directed toward the driver's side of Hoerr's cruiser. As the Buick accelerated backwards, Hoerr was in front of his cruiser and directly in the path of the Buick. While backing away from the rapidly accelerating vehicle, he fired his weapon through the back window of the Buick, aiming at the driver. Rogers also testified that he began to fire his weapon when he saw the Buick was about to strike Hoerr. Rogers Dep. at 21. While Cann was backing up, the officers were all yelling for him to stop and to get out of the car.

As the Buick was backing towards Hoerr, Detective Thorn pulled into the gas station and stopped his vehicle immediately behind Hoerr, inadvertently creating the risk that Hoerr would be crushed between the Buick and Thorn's car. Hoerr was able to jump out of the way of the Buick just before it rammed into the side of Thorn's vehicle, pushing Thorn's vehicle sideways several feet. In the accident reconstruction investigation that was conducted, it was determined that the Buick traveled the 26 feet 9 inches from its stopped position to the impact with Thorn's vehicle in about 3.5 seconds, reaching a speed of about 15 feet per second.

A civilian eyewitness at the scene, John Terzi, corroborates the testimony of the officers.  Terzi states that:

> As the police exited their cars they had their guns drawn and appeared to be yelling at the driver of the black car.[1]  At that time the black car started backing up quickly towards the police car behind it and right at the police officer that was standing between the black car and the police car.  I thought the black car was going to hit the officer and trap him between the cars.  At that time several of the officers began firing their guns from what looked like three sides of the black car.  That black car then swerved a little and smashed into one of the police cars.

Terzi Aff. ¶ 2.

Rakowski testified that, after the Buick crashed into Thorn's vehicle, he assumed that the incident had come to an end.  Rakowski Dep. at 21.  As he was coming around to secure the vehicle, however, the engine began to rev again very loudly and Rakowski testified that he saw the driver reach with his right hand for the gearshift.  The Buick was also coasting forward a bit, rebounding back from the impact with Thorn's vehicle.  At this point, Rakowski and Brown were directly in front of the vehicle.  Believing that Cann was preparing to accelerate forward, Rakowski fired a burst from his weapon.  Reaching the same conclusion, Kilpatrick and Brown opened fire on the driver.

---

[1] The Buick was actually a very dark blue.

7

From the time stamps on still photographs taken from the video surveillance tapes, it appears that from the time the police arrived at the gas station and surrounded the Buick and the time that the firing stopped, less than ten seconds elapsed. Five of the seven officers at the scene fired their weapons. Thorn and Mitchell stated that they did not fire out of concern that they might hit someone in the crossfire. Forty-three rounds were fired, twelve of which struck Cann, and Cann was pronounced dead at the scene. Cann's passenger, Davis, was not hit by any shots or otherwise injured in any way.

On August 11, 2010, Taevon Cann's mother, Gwendolyn Cann, brought this action individually and as personal representative of his estate, naming as defendants each of the officers involved in the incident: Rakowski, Rogers, Brown, Kilpatrick, Thorn, and Hoerr. The Complaint also named Baltimore County as a defendant, asserting that the county was negligent in the training of its officers and that this incident was the result of customs and policies of BCPD. The Complaint asserts a claim for violation of Taevon Cann's civil rights pursuant to 42 U.S.C. § 1983 (Count I); a survival action (Count II); a wrongful death action (Count III); a battery claim (Count IV); and a negligence claim against Baltimore County (Count VI). In addition, the Complaint contains a claim for conversion (Count

V) which is premised on an allegation that $1,784.00 was seized
from Mr. Cann's body and never returned to his mother or to the
estate or otherwise accounted for.

On February 9, 2011, this Court issued an order bifurcating
discovery and dispositive resolution of the claims arising
directly out of the February 29, 2008, incident and the more
general policy and custom claims against the County.  ECF No.
28.  Discovery has been completed relevant to the events of
February 29, 2008, and Defendants now move for summary judgment
as to all claims against the individual defendants.  Because the
claims against the county are derivative of the claims against
the individual defendants, judgment for the individual officers
will also result in judgment for the county.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is proper "if the movant shows that there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a).  In considering a motion for summary judgment, "the
judge's function is not ... to weigh the evidence and determine
the truth of the matter but to determine whether there is a
genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249 (1986).  A dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. In considering the motion, the Court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in h[is] favor," Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002), but the Court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 526 (4th Cir. 2003).

**III. DISCUSSION**

 **A. Section 1983 Claims**

 While Plaintiff asserts in her Complaint that the officers' use of force violated Taevon Cann's rights under the Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, the Fourth Circuit has recently reaffirmed that "'all claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its "reasonableness" standard.'" Noel v. Artson, 641 F.3d 580, 587 (4th Cir. 2011) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis in Graham). Under that now well established standard:

  The "reasonableness" of a particular use of force must
  be judged from the perspective of a reasonable officer

> on the scene, rather than with the 20/20 vision of
> hindsight. . . .   The calculus of reasonableness must
> embody allowance for the fact that police officers are
> often forced to make split-second judgments — In
> circumstances that are tense, uncertain, and rapidly
> evolving — about the amount of force that is necessary
> in a particular situation.   The "reasonableness"
> inquiry in an excessive force case is an objective
> one: the question is whether the officers' actions are
> "objectively reasonable" in light of the facts and
> circumstances confronting them . . . .

Graham, 490 U.S. at 396-97 (internal citations omitted).

Furthermore, "the reasonableness of the officer's actions in

creating the dangerous situation is not relevant to the Fourth

Amendment analysis; rather, reasonableness is determined based

on the information possessed by the officer at the moment that

force is employed." Waterman v. Batton, 393 F.3d 471, 477 (4th

Cir. 2005).   It is also well established that it is

constitutional for a police officer to employ deadly force when

the officer has "probable cause to believe that the suspect

poses a threat of serious physical harm, either to the officer

or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

The Fourth Circuit has applied this reasonableness standard

in a context similar to that presented here.   In Waterman v.

Batson, a police officer for the Maryland Transit Authority

unsuccessfully attempted to stop a speeding motorist, Michael

Waterman, and a high speed chase ensued.   The officers giving

chase radioed ahead to other officers who took positions at the

Harbor Tunnel toll plaza preparing to stop the vehicle.  During
the course of the chase, one of the pursuing officers radioed
that Waterman tried to run him off the road.  As Waterman
approached the toll plaza after exiting the tunnel, two officers
emerged from behind a concrete barrier and, with weapons drawn,
approached the vehicle from the front and passenger sides
yelling for the driver to stop.

Waterman slowed to about 11 miles per hour as he approached
the toll plaza.  After the car ahead of him began to move
forward, the officers observed Waterman's vehicle "lurching" or
"lunging" forward and beginning to accelerate in the general
direction of the toll plaza and the officers.  When Waterman
began to accelerate, one police officer was about 72 feet ahead
of the vehicle; one 38 feet ahead; one a little more than 23
feet ahead, and one a little more than 16 feet ahead.  "Although
none of the officers were directly in front of Waterman's
vehicle, they stood only a few feet to the passenger side of the
vehicle's projected path."  393 F.3d at 474-75.

Perceiving that the lurching and acceleration of Waterman's
vehicle was the beginning of an attempt to run them over, the
officers began firing their weapons as soon as Waterman
accelerated.  As the officers fired, Waterman's vehicle reach a
top speed of about 15 miles per hour.  Waterman passed the

officers, missing them by several feet and then stopped briefly
behind another vehicle blocking his path.  The officers moved
toward him, continuing to fire their weapons until Waterman
passed through the toll plaza.  Between the time Waterman
started to accelerate and the officers stopped firing, about six
seconds elapsed and three officers fired a total of eight
rounds.  Waterman was hit by five of the shots, one of which was
fatal.

Waterman's estate brought an excessive force claim in this
Court and the defendant officers moved for summary judgment on
the ground of qualified immunity.  This Court denied the motion
and the defendants appealed that decision.  On appeal, the
Fourth Circuit framed the question thus: "whether a reasonable
jury could conclude, based on the evidence forecast in the
record, that a perception by the officers that Waterman posed a
threat of serious physical harm to them would have been
unreasonable."  Id. at 477.

In answering that question, the court looks to factors that
both supported and undermined the officers' decision to employ
deadly force.  Supporting the officers decision, the court noted

> (1) that Waterman, by any account, was not acting
> rationally in leading the officers on a more-than-10-
> minute chase;

13

(2) that he was not stopping despite seeing the officers approaching ahead of him with their weapons drawn;

(3) that he was accelerating in the general direction of the officers; and, most importantly,

(4) that [one of the officers giving chase] had reported just minutes before that Waterman had attempted to run him off the road.

Id. at 477-78. Factors undermining the officers' decision included:

(1) that Waterman had not driven recklessly in the 27 seconds between the time he emerged from the Tunnel and the moment he accelerated in their general direction;

(2) that there was no visible damage to Waterman's vehicle or the vehicles of the officers pursuing him;

(3) that other than his flight, no information indicated that Waterman had committed any serious crime prior to reportedly assaulting Officer Watkowski with his vehicle; and

(4) that Waterman had not yet increased his speed past 15 miles per hour or turned his vehicle so that the officers were directly in his path.

Id. at 478.

After considering all these factors, "particularly the split-second nature of the decision," the Fourth Circuit concluded, as a matter of law, that the officers "had probable cause to believe that Waterman's oncoming vehicle posed an immediate threat of serious physical harm at least to [two of the officers]." Id. The critical reality, the court opined, was

14

"that the officers did not have even a moment to pause and ponder these many conflicting factors.  At the instant that Waterman's vehicle lurched forward, the vehicle could have reached [two of the officers] in about one second even without accelerating further, and in even less time if it had continued to accelerate.  Thus, if the officers paused for even an instant, they risked losing their last chance to defend themselves."  Id. [2]

The evidence supporting the use of deadly force here is just as, if not more, compelling.  The officers had to make the same split-second decision.  Furthermore, the officers were all aware that, unlike Waterman, Mr. Cann had a criminal history and that history included handgun violations, assault, resisting arrest, failure to obey a lawful order, and attempting to disarm a police officer.  Unlike the officers in Waterman, Hoerr and, should Cann have placed the revving car in drive, Rakowski and Brown, were in the direct path of the vehicle when they started to fire their weapons.  Furthermore, Cann had turned his vehicle in the direction of an officer.

---

[2] The Court also concluded, however, that any shots fired after Waterman had passed by the officers were unconstitutional, in that the officers were no long in danger.  While finding those shots unconstitutional, the Court nonetheless held that the officers were entitled to qualified immunity as to those shots as well because their unconstitutionality was not clearly established at the time of the incident.  Id. at 483.

In opposing the motion, Plaintiff begins by listing a number of facts that she contends are disputed and material. While some of these facts might be disputed, they are not material under the substantive law. Several of the purported "material" facts relate to what Cann might have been thinking or intending at a particular point in time. For example, Plaintiff posits that it is material whether Cann knew that the plainclothes officers were police officers, whether he intended to run down Hoerr, and whether, after crashing into Thorn's vehicle, Cann was reaching for the gear shift or simply trying to raise his hands to surrender. See Opp'n at 3-4 (Disputed Facts Nos. 1-3, 5-6). As noted above, the reasonableness of the officers' conduct, however, is not judged by what Cann may have been thinking or intending, but on what a reasonable officer observing his behavior would conclude he intended to do.

The remaining "disputed material facts" relate to the issue of whether Cann remained a threat after crashing into Thorn's vehicle. In Plaintiff's view of materiality, however, that issue is also dependent, at least in part, on a determination of Cann's intention at that moment. Plaintiff deems it a material issue whether Plaintiff was intending to raise his hand in surrender or was trying to reach the gear shift to place the car in drive. Opp'n at 4 (disputed facts 5 and 6).

The officers, of course, could not know what Cann was intending, they only knew what they observed.  They had just watched Cann quickly accelerate and smash into a vehicle, missing an officer only because he jumped out of the path of Cann's vehicle.  The engine in Cann's vehicle is revving loudly, the car rocks forward, two officers are directly in the forward path of the vehicle, Cann's right hand is moving and is in the vicinity of the gear shift lever, and the officers have a second or two to decide if Cann is going to now lurch forward in the direction of Rakowski and Brown.

The Fourth Circuit has held that when the use of deadly force is justified to respond to the threat of serious injury to an officer, that use of deadly force will continue to be reasonable until "the justification for the initial force has been eliminated."  <u>Waterman</u>, 393 F.3d at 481; <u>see also</u> <u>Noel v. Artson</u>, 641 F.3d 580 (4th Cir. 2011) (holding that, while woman had been shot twice and was slumped on the floor near the foot of her bed, the threat she posed "certainly had not been 'eliminated'" as she was "still in the room . . . still alive and near her firearm").  In <u>Waterman</u>, the court held that the threat was eliminated at the moment that Waterman's vehicle passed by the officers.  That is far different from the situation the officers faced here.  Even after Cann crashed into

Thorn's vehicle, the apparent threat to the officers was as great, if not greater, than the threat to the officers in <u>Waterman</u> <u>before</u> he drove by them.

Beyond her proffered "material disputed facts," Plaintiff also seems to challenge the decision making process of Defendants that resulted in the confrontation at the gas station.  Plaintiff opines, "When Taevon Cann pulled into the BP gas station it would have been a simple matter for the police to hold their positions and wait for the target vehicle to get back on the road before initiating a felony stop.  The police would then be able to effectuate the felony traffic stop with emergency lights on and sirens wailing.  There would have been no mistake that he was being stopped by the police."  Opp'n at 7-8.  The Fourth Circuit, however, has held that the "reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis."  <u>Waterman</u>, 393 F.3d at 477; <u>Elliott v. Leavitt</u>, 99 F.3d 640, 642 (observing that "court's focus should be on the circumstances at the moment force was used"); <u>Greenidge v. Ruffin</u>, 927 F.2d 789, 792 (4th Cir. 1991) (district court properly excluded evidence of officer's actions leading up to the time immediately prior to the shooting).

Finally, Plaintiff makes an argument in passing that, because Defendants may have made an effort to view the gas station's videos of the incident, the Court should draw an inference that Defendants "were intent on covering up their culpability." Opp'n at 8. After the incident, the Fraternal Order of Police attorney advised Defendants that it would be proper for them to view the videos before giving their written statements. The homicide detectives investigating the incident disagreed that it would be proper and retrieved the copies of the video from Defendants. Only Officer Hoerr actually viewed the video.

Plaintiff maintains that, somehow, the attempt to view the video amounted to a spoliation of evidence from which a negative inference can be drawn. Opp'n at 8 n.5. Spoliation, however, "refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). Here, there is no suggestion that Defendants attempted to destroy or alter the video and, thus, Plaintiff's "spoliation" argument is somewhat incomprehensible. Simply attempting to view the video, on advice of counsel, gives rise to no inference of culpability.

It is certainly tragic that Taevon Cann was killed when the police attempted to take him into custody.  It may be that he did not comprehend that it was police officers that were confronting him; it may be that he was not intending harm to Officer Hoerr when he sped in reverse; it may be that, after crashing into the car behind him, he was attempting surrender and not to speed forward.  What matters, however, it what an officer observing his behavior would reasonably conclude, in a matter of seconds, as to his intentions.  While Defendants may have incorrectly assessed Cann's intent, "the Constitution simply does not require police to gamble with their lives in the face of serious threat of harm."  Elliott, 99 F.3d at 641.[3]

**B. State Law Claims**

In their motion, Defendants assert that if their conduct is found lawful under § 1983, the same principles would apply to the state law battery and wrongful death claims.  See Richardson v. McGriff, 762 A.2d 48, 56 (Md. 2000) (holding that section

---

[3] Because the County's liability under § 1983 is derivative of the liability of the individual officers, the conclusion that the officers are entitled to summary judgment on the § 1983 claims also entitles the County to summary judgment.  See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (a finding that individual police officer inflicted no constitutional injury on the plaintiff removes any basis for liability against municipality).  Similarly, Plaintiff's negligence claim against the County, which is premised solely on an alleged failure to properly train its officers, falls with the claim against the individual defendants.

1983's reasonable officer on the scene standard applies to state law battery claims as well).  In opposing this aspect of the motion, Plaintiff responds to an argument Defendants do not make, opining that, because the officers acted with malice, they are not entitled to public official immunity.  Opp'n at 12. Where there is no basis for liability, the availability of immunity is simply not an issue.

Finally, the County moves for summary judgment on Plaintiff's conversion claim.  Without further specification, Plaintiff alleges that "Baltimore County Police Officers seized One Thousand Seven Hundred Eighty Four Dollars" from Taevon Cann after his death and the County has refused to return the money despite her demand.  Compl. ¶¶ 35-36.  In moving for summary judgment, the County argues that it is not subject to direct suit, but only for the defense and indemnity of its employees. Mot. at 28 (citing Dawson v. Prince George's County, 896 F. Supp. 537, 538-39 (D. Md. 1995)).  Because none of the individual officers named in this suit had anything to do with the seizure or retention of these funds, there is no tortfeasor in this action for the County to defend or indemnify.  Plaintiff makes no response, whatsoever, as to this aspect of Defendants' motion and accordingly, the motion will be granted as to this claim as well.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment will be granted in its entirety.  A separate order will issue.

                                   /s/
                    _____
                    William M. Nickerson
                    Senior United States District Judge


Dated: November 15, 2011